## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

**CIVIL ACTION NO. 4:20-CV-179-JHM**

**NEW YORK MARINE AND GENERAL
INSURANCE COMPANY**                                          **PLAINTIFF**

**V.**

**INGRAM BARGE COMPANY LLC**                                **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Ingram Barge Company's motion for summary judgment. [DN 25]. Fully briefed, this matter is ripe for decision. For the following reasons, Ingram's motion for summary judgment is **GRANTED**.

### I. BACKGROUND

This case arises from the sinking of the workboat M/V Lucky D ("Lucky D") on May 2, 2020, while Ingram Barge Company LLC ("Ingram") was towing it along the Ohio River from Paducah, Kentucky to Henderson, Kentucky. The Lucky D was and still is owned by Audobon Sand & Gravel, LLC, Meuth Construction Supply, Inc., and Meuth Concrete (collectively "Meuth"). [DN 1 at 2, 4]. The month before, Meuth had contacted Ingram about towing the Lucky D and two other vessels from Paducah to Henderson. [DN 32 at 2]. Ingram agreed to do so, and it sent its standard terms and conditions to Meuth. *Id.* Meuth signed the contract without discussing those terms with Ingram, believing that they were non-negotiable and that Ingram would not offer any other deals with different terms. *Id.*

Section 15, paragraph 1 ("the exculpatory clause") of the contract included the following provision:

> 15. **Insurance and Indemnity:** In connection with all towage undertaken pursuant to these terms and conditions, and for any vessels provided by Ingram, Ingram will

maintain Protection and Indemnity insurance covering tower's liability on SP-23 or equivalent terms, and pollution coverage on terms equivalent to that provided by WQIS, with minimum limits of $100,000,000.00 in any combination of primary and excess coverage, together with hull insurance for the agreed value of its vessels, all for the purpose of insuring Ingram's liabilities which arise from its operations. Customer shall maintain hull insurance at agreed values on all barges/vessels tendered for transport under these terms and conditions, and shall cause said underwriters to waive subrogation against Ingram for any hull damage claims up to $10,000.00, provided, however, that if the actual damage to the barge exceeds $10,000.00, *and such damage is a result of Ingram's sole negligence, recklessness or intentional misconduct*, then Customer shall be free to assert the total claim on each such barge where the claim exceeds $10,000.00, including the first $10,000.00 of damage.

[DN 32 at 2–3] (emphasis added).

In addition to the above paragraph, Section 15 also contained paragraph 3, an indemnity provision for personal injuries arising out of the presence of any non-Ingram employee on the Lucky D or on Ingram's tug.

In the event that Customer designates any representatives, surveyor, inspector, super cargo, or other third party to travel with the vessel being towed, or to board any Ingram vessel or tow during the course of services provided by Ingram, then customer further agrees to protect, defend, and indemnify Ingram, its vessel and crew against any claim of injury, death or other liabilities arising from the presence of said individual aboard Ingram's vessels or tow. As a separate obligation, customer agrees to name Ingram as alternate employer and/or waive subrogation against Ingram under the employer's liability policy pertaining to said employee, or to cause Ingram to be protected as an additional insured under the customer's CGL policy with waiver of subrogation and waiver of the non-owned water craft exclusion, and with coverage for contractually assumed liabilities, or the equivalent of coverage under a P&I policy in place for the vessel tendered by customer for towage.

[DN 32 at 3].

Ingram began towing the Lucky D and another Meuth vessel (the third vessel remained in drydock and never left Paducah) on April 30 as part of a larger tow.  [DN 25 at 2; DN 32 at 2–3]. Two days later, the tow had made it most of the way to Henderson—between miles 819 and 814 of the Ohio River—when the incident in question occurred.  [DN 25 at 2; DN 32 at 3].  That day, Ingram claims—and the plaintiff, New York Marine and General Insurance Company ("NY

2

Marine"), does not dispute—that three Meuth employees met the tow midstream and boarded the Lucky D while it was still in transit. [DN 25 at 2]. Meuth's engineer informed the tow's pilot over the radio that the Meuth crew intended to start up the Lucky D and use it to separate the other Meuth vessel from the tow and take it to Henderson without Ingram's aid. [DN 25 at 3–4]. During this process, Ingram's rigging that adhered the Lucky D to the tow snapped. [DN 32 at 3]. Less than twenty seconds later, the Lucky D was fully submerged in the river. [DN 32 at 4]. Fortunately, every person involved escaped unharmed. [DN 25 at 4].

Meuth managed to raise and refloat the Lucky D, but the workboat still suffered considerable damage from the sinking. [DN 1 at 4]. Meuth also incurred substantial costs associated with raising the vessel and bringing it back to shore. *Id.* NY Marine partially compensated Meuth for these expenses. *Id.* In an effort to recover the money it paid Meuth, NY Marine filed this negligence claim against Ingram on October 19, 2020. *Id.*

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying the portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

3

574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

#### A.  The Lack of Dispute that Both Parties Share Some Fault

Both sides assert that the other was at fault.  However, neither side disputes the other's claims that it shares at least some of the blame, and neither side claims that the other was solely at fault.  NY Marine claims that Ingram was negligent, and there is evidence suggesting that Ingram employees may have been negligent by not instructing the Meuth crewmen to close the Lucky D's engine-room doors, by organizing the tow in an improper configuration, and by using ineffective riggings.  [DN 25-13 at 4, 7–8].  Ingram does not dispute the evidence of its negligence.

But Ingram counters that Meuth was also negligent, so NY Marine cannot recover because the exculpatory clause says that the insurer waives subrogation unless Ingram's fault was the sole cause of the loss.  [DN 25 at 10–11; DN 32 at 3].  In its motion, Ingram presented evidence that the Meuth crew members left the Lucky D's engine room doors open after they boarded the vessel mid-voyage and started its engines.  [DN 25 at 8–9].  It also presented testimony from NY Marine's own expert which stated that leaving the engine room doors open likely caused the Lucky D to take on water and sink.  [DN 25 at 7–8].  In its response, NY Marine did not make any effort to dispute the evidence of Meuth's negligence or point to anything in the record showing a dispute

as to Meuth's partial fault.  By not contesting fault, NY Marine effectively concedes that if the exculpatory clause is enforceable, the Meuth/Ingram contract precludes its recovery.

### B.  Legal Restrictions on Contractual Liability Waivers and Limitations

Instead of disputing Ingram's claim that Meuth was at least partially at fault, NY Marine devotes the bulk of its response brief to arguing that the exculpatory clause is invalid due to federal public policy. NY Marine primarily relies on the Supreme Court's rule from *Bisso v. Inland Waterways Corp.* and its progeny.  349 U.S. 85 (1955).  In *Bisso*, the Court considered a towing contract that provided that the towing would occur at the barge's "sole risk," exonerating the tower from liability for negligence.  *Id.* at 86.  The Court reasoned that its cases dating back to the 19th century, such as *The Syracuse*, pointed to a "judicial rule, based on public policy, invalidating contracts releasing towers from all liability for their negligence." *Id.* at 90; *see The Syracuse*, 79 U.S. 167 (1870) (invalidating contract provision stating a steamboat would be towed "at her own risk"); *see also Bos. Metals Co. v. The Winding Gulf*, 349 U.S. 122 (1955) (invalidating towage contract that said tower would not be responsible for its negligence).  The Supreme Court implicitly extended the *Bisso* rule to cases where a party contractually waives its insurance company's subrogation rights in *Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co.*, 372 U.S. 697 (1963).  In *Dixilyn*, the Fifth Circuit had upheld a contract provision that indirectly waived the tower's liability by stating that insurance companies could not be subrogated to recover the money they paid to clients harmed by the tower's negligence.  *Crescent Towing & Salvage Co. v. Dixilyn Drilling Corp.*, 303 F.2d 237, 240–42 (5th Cir. 1962), *rev'd,* 372 U.S. 697 (1963).  The Supreme Court reversed the Fifth Circuit, opining that its decision was "squarely in conflict with our holding in [*Bisso*]," showing that a clause waiving subrogation is not a valid way around the *Bisso* rule. *Dixilyn*, 372 U.S. at 698.

But in its framing of the *Bisso* line of cases, NY Marine neglects to consider their most important word: "all." *Bisso* says that the Supreme Court's cases establish a rule "invalidating contracts releasing towers from *all* liability for their negligence." *Bisso*, 349 U.S. at 90 (emphasis added). By its text, *Bisso* only applies to cases where the contract completely exonerates the tower from negligence liability. In fact, all the Supreme Court cases NY Marine cites address contracts that exempted the tower from all negligence liability in all circumstances. *See, e.g., Dixilyn*, 372 U.S. at 698 (exculpatory clause held invalid where barge owner agreed in the towage contract to assume liability for *all* losses arising from the towage).

The Sixth Circuit reads the word "all" in *Bisso* to be significant, as it has consistently upheld towage contracts that limit a tower's negligence liability to something less than all of it. In *Canarctic Shipping Co. v. Great Lakes Towing Co.*, the court considered a contract clause that limited the tower's negligence liability to a $1,000 daily rate, preventing an aggrieved shipping company from recovering the almost $60,000 in damages it suffered. 670 F.2d 61, 62–63 (6th Cir. 1982). The court upheld the provision, stating that "*Bisso* does not invalidate all limitations on liability. . . . *Bisso* states that a towing company may not exempt itself from *all* liability for negligent towage." *Id.* at 63 (emphasis added). But a contract that "merely limits in advance" what a customer can recover for the tower's negligence is perfectly valid. *Id.* *Canarctic* accords with the circuit's earlier statement that a tower "may impose just and reasonable limitation upon their common-law liability not amounting to an exemption from the consequences of their own negligence." *Midland S.S. Line, Inc. v. The Arkansas*, 232 F.2d 81, 83 (1956) (citing *The Queen of the Pacific*, 180 U.S. 49 (1901)). This Court reads these cases to mean that in this circuit, liability limitations in towage contracts should be upheld so long as they do not exculpate towers from "all" negligence liability.

C.  Bisso *and* Canarctic's *Application to This Contract's Exculpatory Clause*

NY Marine argues that Ingram "include[d] a complete exoneration of negligence liability in the form of a waiver of subrogation" in its contract with Meuth, just like the contracts in *Bisso* and *Dixilyn*.  [DN 32 at 9].  But this is not an accurate description of the Meuth/Ingram contract at all.  The exculpatory clause eliminates insurers' subrogation rights in some instances, but it exposes Ingram to full liability to insurers in others.  [DN 32 at 2–3].  Both parties interpret the contract to say that if a claim is for less than $10,000, or if Ingram is not solely at fault, Meuth's insurer cannot sue Ingram.  [DN 32 at 11; DN 34 at 5].  But if the claim exceeds $10,000 and Ingram is solely at fault, then Ingram must pay the insurer for *all* damages Ingram caused, with no upper limit.  *Id.*  This provision is unlike both the total waiver of liability in *Bisso* and the waiver of all subrogations in *Dixilyn*.  By the same token, it is also unlike the numeric liability ceiling in *Canarctic*.  None of the precedent this Court is bound to follow covers a contract quite like this one.

Without a case directly on point, the Court elects to treat the exculpatory clause as a valid contract provision limiting—but not eliminating—liability, analogous to the *Canarctic* contract the Sixth Circuit upheld.  NY Marine is asking the Court to extend the *Bisso* rule to a new and different set of facts.  The Court is wary of extending this precedent without direction from a higher court, especially given that federal courts across the country are trending toward limiting *Bisso*.  *See, e.g., La Esperanza de P.R., Inc. v. Perez y. Cia. De Puerto Rico, Inc.*, 124 F.3d 10, 19 (1st Cir. 1997) (observing that exculpatory provisions in marine contracts "are today routinely enforceable" as long as they do not waive all liability).  Further, it would make little sense to extend *Bisso* to this case because the exculpatory clause exposes Ingram to far more potential liability than the provisions the Sixth Circuit has already declared valid.  Unlike the tower in *Canarctic*,

where the towing contract limited it to paying $1,000 a day in damages for negligence, there is no upper limit to the damages Ingram could be forced to pay if it is solely at fault.  670 F.2d at 62–63; [DN 32 at 3].  It would be incongruous for courts in this circuit to allow towers to limit their liability to relatively low dollar amounts but to disallow them from risking liability that could potentially bankrupt their companies.

Finally, facts of this case do not fit the public policy rationale behind *Bisso*'s public policy rule.  The Supreme Court has stated that *Bisso* rests on two towing-specific public policy concerns: unequal bargaining power and insufficient discouragement of negligence.  *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15–16 (1972) (quoting *In re Unterweser Reederei, Gmbh*, 428 F.2d 888, 907 (5th Cir. 1970) (Wisdom, J., dissenting) *vacated sub nom.*, 407 U.S. 1 (1972)).  When applied to this case, these considerations weigh in favor of enforcing the Meuth/Ingram contract.

There is no evidence in the record indicating there was an imbalance of bargaining power between Meuth and Ingram.  While Meuth understood that Ingram's terms and conditions were not negotiable, it was not forced to either agree to Ingram's deal or not get its vessels towed at all.  [DN 32-1 at 2].  NY Marine does not claim that Ingram has a monopoly on towing from Paducah to Henderson.  [DN 34 at 8].  Meuth could have gone to another tower and received different terms.

NY Marine urges that the Supreme Court removed the consideration of unequal bargaining power from the *Bisso* analysis in *Dixilyn*, because there the Court reversed a Fifth Circuit panel that upheld the contract at issue because there was not unequal bargaining power.  [DN 32 at 8]; *Dixilyn*, 372 U.S. at 698.  Either NY Marine overstates the significance of *Dixilyn*, or the Supreme Court changed its mind ten years later when, as stated above, it reaffirmed the two public policy considerations undergirding *Bisso* in *M/S Bremen. See M/S Bremen*, 407 U.S. at 16.  Further, the Sixth Circuit clearly considered the parties' comparable bargaining power when it upheld the

contract in *Canarctic*.  670 F.2d at 63 ("We also reject Canarctic's argument that the tariff provision is invalid because Great Lakes is in a position to drive a hard bargain. Nothing in the record hints at any inequality of bargaining power.").

The exculpatory clause also more than sufficiently discourages negligent conduct by Ingram.  As previously discussed, whenever Ingram is solely at fault, it exposes itself to limitless liability that could potentially drive it out of business.  [*See* DN 32 at 3]; *see also La Esperanza*, 124 F.3d at 19 (quoting *Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F. 2d 46, 55 (5th Cir. 1967)) ("[T]he prospective wrongdoer's potential liability should be enough to deter negligence." (internal quotation marks omitted)).  The fact that Ingram could get off the hook if another party is also negligent is highly unlikely to impact Ingram's behavior because it cannot control third parties' carefulness.

### D.  Section 15, Paragraph 3

NY Marine also contends that Section 15, paragraph 3 of the Meuth/Ingram contract is invalid under *Dixilyn*.  [DN 32 at 13–15].  That provision requires Meuth to indemnify Ingram for any judgment against it for damages to the vessels it tows.  [DN 32 at 3].  However, because paragraph 1 of that section is enforceable, Ingram does not have to pay any damages for the property damage to the Lucky D irrespective of paragraph 3's validity.  Therefore, the Court need not decide whether paragraph 3 is also valid.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Ingram's motion for summary judgment [DN 25] is **GRANTED**.  All remaining motions are **DENIED AS MOOT**.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc: counsel of record

September 6, 2022